**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TIO DINERO SESSOMS,
            *Petitioner-Appellant,*

v.

D. L. RUNNELS,
            *Respondent-Appellee.*

No. 08-17790

D.C. No.
2:05-cv-01221-
JAM-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
John A. Mendez, District Judge, Presiding

Argued and Submitted
March 20, 2012—San Francisco, California

Filed August 16, 2012

Before: Alex Kozinski, Chief Judge, Mary M. Schroeder,
Betty B. Fletcher, Barry G. Silverman,
Kim McLane Wardlaw, Raymond C. Fisher,
Richard A. Paez, Consuelo M. Callahan, Milan D. Smith, Jr.,
Sandra S. Ikuta, and Mary H. Murguia, Circuit Judges.

Opinion by Judge B. Fletcher;
Concurrence by Judge Fisher;
Dissent by Judge Murguia

**COUNSEL**

Eric Weaver (argued), Albany, California, for petitioner-appellant Tio Dinero Sessoms.

Edmund G. Brown, Attorney General of California, Michael P. Farrell, Senior Assistant Attorney General, Charles A. French, Supervising Deputy Attorney General, Jeffrey D. Firestone (argued), Deputy Attorney General, Sacramento, California, for respondent-appellee D. L. Runnels.

Peter C. Pfaffenroth, (argued), HL Rogers, Brian A. Fox, Sidley Austin LLP, Washington, D.C.; Mark E. Haddad, Douglas A. Axel, Sidley Austin LLP, Los Angeles, California; David M. Porter, Sacramento, California, for amicus National Association of Criminal Defense Lawyers.

**OPINION**

B. FLETCHER, Circuit Judge, with whom SCHROEDER, WARDLAW, FISHER, PAEZ, and M. SMITH, Circuit Judges, join in full:

Tio Sessoms, a nineteen-year-old black man, sat alone in an eight-by-ten foot interrogation room. Five days earlier, on the

advice of his father, Sessoms had turned himself in to the local police. Before doing so, Sessoms's father told his son: you must ask for a lawyer before talking to the police.

Sessoms followed his father's advice. When the two police officers entered the interrogation room, Sessoms sat slouched in his chair. He looked up and they exchanged brief pleasantries. Forty seconds after the officers entered the room and before they read Sessoms his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), the following exchange occurred:

| Sessoms: | There wouldn't be any possible way that I could have a — a lawyer present while we do this? |
|---|---|
| [Detective]: | Well, uh, what I'll do is, um — |
| Sessoms: | Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer.[1] |

Instead of immediately ceasing the interrogation, the officers persevered and convinced Sessoms that the only way to tell his side of the story was to speak to them without an attorney. Eventually, Sessoms agreed to talk and made incriminating statements.

We hold that the California Court of Appeal unreasonably applied clearly established Supreme Court precedent when it concluded that Sessoms was required under *Davis v. United States*, 512 U.S. 452, 459 (1994), to unambiguously invoke his right to counsel. We reverse the district court's judgment and remand with directions to grant a conditional writ of habeas corpus.

---

[1]The transcript of the colloquy says "Give me a lawyer," but Detective Woods, after comparing the transcript to the videotape, testified that Sessoms said "Get me a lawyer." We find this distinction irrelevant to our analysis.

## I.  Facts and Procedural History

On October 20, 1999, Sessoms and two others burglarized Edward Sheriff's home. During the burglary, one of Sessoms's accomplices choked and repeatedly stabbed Sheriff.

Sessoms then fled from California to Oklahoma. There, at his father's urging, Sessoms surrendered to Oklahoma police on November 15, 1999. His father advised him to ask for a lawyer before talking to the police. Sessoms was in custody for four days before being interrogated. On November 19 or 20, two police officers, Detectives Woods and Keller, flew from California to Oklahoma to question Sessoms at the county jail where he was being held.

The entire interrogation was videotaped. The video shows Sessoms sitting alone, talking to himself and quietly saying, "I'm not a criminal, but I got [inaudible]. They didn't tell me if I have a lawyer. I know I want to talk to a lawyer."[2] When the detectives entered the room, the following exchange took place:

| | |
|---|---|
| Det. Woods: | . . . Tio, I'm Dick. |
| Sessoms: | How you doing, all right. You already know me. |
| Det. Woods: | You say . . . |
| Det. Keller: | Tio, Pat Keller. |
| Det. Woods: | You say Tio or Theo? |
| Sessoms: | It — my name is pronounced Tio because it's Spanish. |

---

[2]Sessoms's statements to himself were made prior to the detectives entering the room and there is no evidence that any law enforcement officers heard these statements.

| | |
|---|---|
| Det. Woods: | Tio. Okay. |
| Det. Keller: | Why don't we swap corners here for a minute, you guys? Go ahead and sit here. |
| Sessoms: | So glad you fellows had a safe flight. |
| Det. Woods: | Huh? |
| Sessoms: | I'm glad you fellows had a safe flight out here. |
| Det. Keller: | So are we. Huh. |
| Det. Woods: | Well, we want a safe one back too. |
| Sessoms: | Oh, you know [inaudible]. |
| Det. Woods: | Yeah. Uh, we both, uh — both from, uh, Sacramento PD and, uh — |
| Sessoms: | There wouldn't be any possible way that I could have a — a lawyer present while we do this? |
| Det. Woods: | Well, uh, what I'll do is, um — |
| Sessoms: | Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer. |

Woods proceeded as though Sessoms said nothing. Instead of ending the interrogation, Woods persuaded Sessoms that having a lawyer was a bad idea. Sessoms explained that he

was concerned that some police officers "end up switching your words afterwards," to which Woods responded that he had no intention of playing any "switch games" and would even tape record the conversation to allay Sessoms's fears. Woods then explained the situation: Sessoms and his two accomplices were all being "charged with the same thing." Woods said he already knew "what happened" because Sessoms's accomplices had waived their rights "and laid it out from A to Z." Woods reassured Sessoms that he believed that Sessoms "did not participate in the stabbing," but warned that if Sessoms didn't make a statement right then and there, Woods wasn't going to be able to "get his version of it" because "most all attorneys — in fact, all attorneys — will sometimes or usually advise you not to make a statement." He then said he didn't really "need [Sessoms's] statement to make [the] case" anyway because he "already [had] two and a half other complete statements," reiterating that he already "[knew] what happened."

Only then—after telling Sessoms that having a lawyer would only hurt him, and that invoking his right to counsel would be futile because the police already knew what happened—did the police even read Sessoms his rights under *Miranda*. Sessoms eventually said "Let's talk," and proceeded to implicate himself in the crime.

Prior to trial, Sessoms moved to suppress the incriminating statements, arguing that he had clearly invoked his right to counsel. The trial court denied the motion. Sessoms went to trial and was convicted of murder, robbery, and burglary, with the special circumstance that he was engaged in the commission or attempted commission of the crimes of robbery and burglary when the murder occurred. He was sentenced to life in prison without the possibility of parole.

Sessoms appealed to the California Court of Appeal. That court analyzed Sessoms's statements under the rule of Davis: a request for counsel must be unequivocal or unambiguous.

The state court then determined that Sessoms's statements did not satisfy Davis's requirement. It found that "although [Sessoms] twice explicitly referred to an attorney, neither statement was an unequivocal or unambiguous request for counsel." *People v. Sessoms*, No. C041139, 2004 WL 49720, at *3 (Cal. Ct. App. Jan. 12, 2004). According to the state court, Sessoms's first statement was "legally indistinguishable" from the statements made in *Davis,* 512 U.S. at 455 ("Maybe I should talk to a lawyer") and *People v. Crittenden*, 9 Cal. 4th 83, 123-24 ("Did you say I could have a lawyer?"), which were not unequivocal requests for an attorney. *Sessoms*, 2004 WL 49720, at *3. Sessoms's second statement, the state court continued, was also not an unequivocal request for an attorney, but rather "[a]t best . . . a statement of his father's advice to him." *Id*. Ultimately, the California Court of Appeal concluded that Sessoms's statements were equivocal and not " 'sufficiently clear[ ] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.' " *Id.* (citing *Davis,* 512 U.S. at 459).

Sessoms then filed a federal habeas petition. The district court denied the petition but granted a certificate of appealability on his *Miranda* claim and his ineffective assistance of counsel claim. A divided three-judge panel upheld the district court's denial of Sessoms's habeas petition. The panel majority recognized that "[b]ecause Sessoms's statements were made *prior* to his *Miranda* waiver, *Davis* cannot apply as 'clearly established Federal law' in this case." *Sessoms v. Runnels*, 650 F.3d 1276, 1283 (9th Cir. 2011). But the panel majority held that it was not unreasonable for the state court to require an unambiguous request for counsel and concluded that Sessoms's request was ambiguous. *Id.* We granted rehearing en banc. We now conclude that the state court's decision was an unreasonable application of clearly estab-

lished federal law. We therefore reverse the district court's denial of habeas relief.[3]

## II.   Standard of Review

We review de novo the district court's denial of a petition for a writ of habeas corpus brought under 28 U.S.C. § 2254. *Robinson v. Schriro*, 595 F.3d 1086, 1099 (9th Cir. 2010). Because Sessoms's habeas petition was filed after April 24, 1996, we apply AEDPA. Under AEDPA, Sessoms is entitled to federal habeas relief if he can show that the state court's adjudication of the merits of his claim was "contrary to" then-established Supreme Court precedent; was "an unreasonable application of" such law; or "was based on an unreasonable determination of the facts" in light of the state court record. 28 U.S.C. § 2254(d); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

A state court decision is "contrary to" clearly established Supreme Court precedent if it (1) "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases"; or (2) reaches a different result on a "materially indistinguishable" set of facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state-court decision involves an "unreasonable application" of clearly established federal law if the state court (1) "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the . . . case"; or (2) "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

This case illustrates the difficulty in defining the precise contours of the "contrary to" and "unreasonable application"

---

[3]Because we conclude that Sessoms is entitled to relief on his *Miranda* claim, we need not address his ineffective assistance of counsel claim.

prongs of § 2254(d)(1). Indeed, *Williams* itself recognized that in many cases it will be "difficult to distinguish a decision involving an unreasonable extension of a legal principle," warranting relief under the "unreasonable application" clause "from a decision that arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," warranting relief under the "contrary to" clause. *Id.* at 408 (internal quotation marks omitted). Deciding whether this case falls into the unreasonable extension of legal principle or incorrect choice of law category involves, as the Supreme Court in *Williams* described, some "problems of precision." *Id.* Regardless, "it is clear that both [standards] are met when the state court has failed to follow the law as set forth by the Supreme Court." *Wade v. Terhune*, 202 F.3d 1190, 1195 (9th Cir. 2000). The state court decision is both contrary to and involves an unreasonable application of Supreme Court precedent because it unreasonably extended the principle from *Davis* to a new context where it should not apply and because it analyzed Sessoms's case using the incorrect legal framework.

## III.   Discussion

We begin by identifying the Supreme Court's applicable legal principles. The landmark case of *Miranda v. Arizona* established certain safeguards that must be afforded to a suspect in custody, including the right to have counsel present during a custodial interrogation. 384 U.S. 436 (1966). The Supreme Court has refined its analysis of the *Miranda* right to counsel in a series of cases including, as relevant here, *Edwards v. Arizona*, 451 U.S. 477 (1981), and *United States v. Davis,* 512 U.S. 452 (1994).

### A.

In *Miranda*, the Supreme Court established rules the police must follow to ensure certain "basic" and "precious" rights "enshrined in our Constitution." 384 U.S. at 442. These rights

include the Fifth Amendment's guarantee that "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. One of the *Miranda* Court's primary concerns was the temptation for law enforcement, operating with little or no supervision of their investigative actions, to overbear a defendant in an isolated interrogation setting. 384 U.S. at 461. The Fifth Amendment privilege, explained the Court, "protect[s] persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467.

*Miranda* recognized that overzealous police practices during a custodial interrogation create the potential for compulsion in violation of the Fifth Amendment. *Id.* at 455-58. Indeed, some of the tactics of which *Miranda* warns were employed by the interrogators in this case. After Sessoms asked for an attorney, Woods persisted in his questioning. He told Sessoms he already knew what happened, and that Sessoms's accomplices had already confessed and laid it out from A to Z, thereby "display[ing] an air of confidence in [Sessoms's] guilt" and appearing only to be "interest[ed] in confirming certain details." *Id.* at 450. Woods offered Sessoms a "legal excuse[ ]" and assured him that he knew Sessoms did not participate in the stabbing. *See id.* at 451-52. But then Woods immediately reversed course, telling Sessoms that he didn't really need his statement to make the case anyway, because Sessoms's accomplices had already talked, thereby placing Sessoms "in a psychological state where his story [was] but an elaboration of what the police purport[ed] to know already—that he [was] guilty." *Id.* at 450. Eventually, the officers, much like *Miranda* warns, overwhelmed Sessoms and persuaded him "out of exercising his constitutional rights." *Id.* at 455.

**[1]** In order to assure that the use of such psychological tactics to exploit a suspect's vulnerabilities did not run afoul of the Fifth Amendment, *Miranda* set forth clear mandates:

"[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Id.* at 444. If a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney," all questioning must cease.[4] *Id.* at 444-45. These protective devices are necessary to dispel the inherent compulsion of custodial interrogations and "to insure that what was proclaimed in the Constitution had not become but a form of words in the hands of government officials." *Id.* at 444 (internal citation and quotation marks omitted).

Fifteen years later, in *Edwards v. Arizona*, the Supreme Court reaffirmed the view that the "assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' " *Edwards,* 451 U.S. at 485 (quoting *Miranda*, 384 U.S. at 474). In *Edwards*, the suspect was arrested and taken to the police station. *Id.* at 478. He requested counsel, at which point all questioning ceased. *Id.* at 479. The next day, the police visited Edwards in jail, but he told the jail guard that he did not want to talk to anyone. *Id.* The guard told Edwards that "he had to" talk to the police, and Edwards eventually confessed. *Id.* The Supreme Court held that Edwards's Fifth Amendment rights were violated and "reconfirm[ed]" that a suspect, "having expressed his desire to deal with the police only through counsel,"[5] must not be "subject

---

[4]The dissent cites this same passage, but then curiously, states that *Miranda* says nothing about what the police must do when a suspect's invocation is ambiguous. But *Miranda* explicitly addresses this issue—a suspect can request an attorney "in any manner." 384 U.S. at 444-45 (emphasis added).

[5]The dissent correctly states that under AEDPA, the holdings and not the dicta constitutes clearly established federal law. Dissent at 9324. But then the dissent goes on to rely on dicta from *Edwards* to support its conclusion that even *Edwards* requires a suspect to "clearly" assert his rights

to further interrogation by the authorities until counsel has been made available to him." *Id.* at 484-85. The purpose of the *Edwards* rule is "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990), and to ensure that police "will not take advantage of the mounting coercive pressures of prolonged police custody," *Maryland v. Shatzer*, 130 S. Ct. 1213, 1220 (2010) (internal citations and quotation marks omitted).

The Supreme Court revisited the scope of *Miranda* and *Edwards* in *Davis v. United States*. There, the Court confronted a scenario where Davis had executed a written waiver of his rights and expressly agreed to speak to the police. 512 U.S. at 454-55. Only after being questioned for ninety minutes did Davis utter the words "[m]aybe I should talk to a lawyer." *Id.* at 455. In deciding the case, the Supreme Court again reaffirmed the fundamental principle that "if a suspect requests counsel at any time during [a custodial] interview, he is not [to be] subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458 (citing *Edwards*, 451 U.S. at 484-85).

**[2]** The Court went on to clarify, however, that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require

to counsel. Dissent at 9327. Just as with the holding in *Davis*, *see infra* n. 5 and accompanying text, what is the holding in *Edwards* is unmistakable: "We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484. The Edwards's Court reference to the requirement that a suspect's invocation be "clear" is dicta and cannot be relied upon.

the cessation of questioning." *Id.* at 459. "Rather, the suspect must unambiguously request counsel." *Id.*[6]

The Court explained the reasoning behind this requirement as follows:

> A suspect who knowingly and voluntarily waives his right to counsel after having that right explained to him has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

*Id.* at 460-61. The Court ultimately concluded that the statement "[m]aybe I should talk to a lawyer" was not an unambiguous or unequivocal request for counsel. *Id.* at 462.

**[3]** But *Davis* clearly limits its holding to statements made *after* a suspect has waived his *Miranda* rights: "We therefore hold that, *after* a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney."[7] *Id.* at 461 (emphasis added); *see also United States v. Rodriguez*, 518 F.3d 1072, 1079 (9th Cir. 2008) ("*Davis* addressed what the suspect must do to *restore* his *Miranda* rights after having already knowingly and voluntarily waived

---

[6]The dissent accuses us of misinterpreting *Davis* by "selectively lift[-ing]" language to support the majority's view. In light of the facts of the case (after being Mirandized and talking to the police for more than an hour, Davis made an unambiguous invocation) and *Davis*'s crystal clear holding (requiring an unambiguous invocation "after a knowing and voluntary waiver of the *Miranda* rights,"), the only logical interpretation of the passage quoted by the dissent is that an unambiguous statement is required after waiver.

[7]We rely on the Supreme Court's holdings and we cannot imagine a more clear holding than the one made here.

them."); 2 Wayne R. LaFave, et al., Criminal Procedure § 6.9(g), n. 185 (3d ed. 2007 & Supp. 2012) ("*Davis* is . . . limited [to the post-waiver context]." (internal citations omitted)). When there has not been a knowing and voluntary waiver, "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,' " *Davis,* 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)), but the assertion need not be "unambiguous or unequivocal," *id.* at 462. Thus, where the suspect has not waived his rights, Davis's rule is inapplicable. We therefore agree with Sessoms that the California Court of Appeal unreasonably extended *Davis* to requests for counsel that, like his, were made before a valid waiver of *Miranda* rights. *See Williams*, 529 U.S. at 407.

The state argues, however, that the Supreme Court's recent decision in *Berghuis v. Thompkins* suggests that *Davis* applies to all requests for counsel, whether pre- or post-waiver. 130 S. Ct. 2250 (2010). After being informed of his *Miranda* rights, the suspect in *Berghuis* refused to sign a waiver form and simply remained silent through almost three hours of interrogation before making an incriminating statement. *See id.* at 2255-27. The Supreme Court concluded that the suspect never invoked his right to silence. *Id.* at 2260. Relying on *Davis*, the Court held that an invocation of the right to remain silent, like the right to counsel, must be unambiguous. *Id.* In reaching that decision, the Court provided this description of its holding in *Davis*:

> In the context of invoking the *Miranda* right to counsel, the Court in *Davis v. United States* held that a suspect must do so "unambiguously." If an accused makes a statement concerning the right to counsel "that is ambiguous or equivocal" or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights.

*Id.* at 2259-60 (internal citations omitted). As the state points out, this description of *Davis* draws no distinction between ambiguous statements made before or after *Miranda* rights were waived.

Nonetheless, a critical factual distinction between Sessoms's statements and those evaluated by the Court in both *Davis* and *Berghuis* remains: Sessoms made his statements before he was informed of his rights under *Miranda*. The *Miranda* Court held that the coercive atmosphere of interrogation makes it essential for a suspect to be "given a full and effective warning of his rights at the outset of the interrogation process." 384 U.S. at 445. As the Court stressed, when "the police [have] not advised the defendant of his constitutional privilege . . . at the outset of the interrogation," the suspect's "abdication of [that] constitutional privilege—the choice on his part to speak to the police—[is] not made knowingly or competently because of the failure to apprise him of his rights." *Id.* at 465 (citing *Escobedo v. Illinois*, 378 U.S. 478 (1964)).

Both *Davis* and *Berghuis* recognize that the suspect must be given *Miranda* warnings before any interrogation. In *Berghuis*, the Court wrote that it need not "add marginally" to *Miranda's* prophylactic protections by "[t]reating an ambiguous . . . statement as an invocation of *Miranda* rights," because "full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process." 130 S. Ct. at 2260. Similarly, in *Davis*, the court emphasized that the "primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves" and that, "*after* having [those] right[s] explained to him," a suspect must invoke his rights "affirmatively." 512 U.S. at 460-61 (emphasis added).

**[4]** In light of these instructions from the Supreme Court, it is clear that *Berghuis* does not alter *Davis*'s requirement that an unambiguous invocation can apply only after a suspect

has been informed of his *Miranda* rights. Not only are the
Supreme Court cases on this point pellucid, their rationale
makes eminent sense. A person not aware of his rights cannot
be expected to clearly invoke them. Once, however, a suspect
has been read his *Miranda* rights, it is reasonable to ascribe
to him knowledge of those rights. If at some later point during
the custodial interrogation he decides that he wants an attor-
ney, he should be held to a higher standard of clarity to
invoke that right. That is precisely what *Davis* concluded.
Thus, if a suspect invokes his rights before the *Miranda* warn-
ings are given, the invocation must be analyzed under the rule
of *Miranda* and *Edwards*, not that of *Davis*. We therefore
conclude that the California Court of Appeal unreasonably
extended *Davis*'s clear invocation rule to a situation where it
does not apply. Sessoms requested an attorney before receiv-
ing a clear and complete statement of his rights and, therefore,
knowledge of his rights cannot be ascribed to him. In this cir-
cumstance, the clear invocation rule simply should not have
been applied.

   **[5]** Because the California Court of Appeal unreasonably
applied clearly established Supreme Court precedent,
AEDPA's restrictions do not apply. *Panetti v. Quarterman,*
551 U.S. 930 (2007) (stating that when "the requirement set
forth in § 2254(d)(1) is satisfied[, a] federal court must then
resolve the [constitutional] claim without the deference
AEDPA otherwise requires"); *Frantz v. Hazey,* 533 F.3d 724,
736-37 (9th Cir. 2008) (en banc) ("where the analysis on fed-
eral habeas . . . results in the conclusion that § 2254(d)(1) is
satisfied, then federal habeas courts must review the substan-
tive constitutionality of the state custody de novo"). There-
fore, using the correct legal framework we consider de novo
whether Sessoms invoked his right to counsel. Under
*Miranda* and *Edwards*, Sessoms could "indicate[ ] in any
manner and at any stage of the process that he wishe[d] to
consult with an attorney," *Miranda*, 384 U.S. at 444-45, so
long as he "expressed his desire to deal with the police only
through counsel," *Edwards*, 451 U.S. at 484; *see also McNeil*,

501 U.S. at 178 ("It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police."). Sessoms's statements easily meet this standard.

## B.

Police officers spend their days interacting with ordinary people in our cities and neighborhoods and are surely well acquainted with how ordinary people speak. Recognizing this, the Supreme Court has directed that a defendant's words should be "understood as ordinary people would understand them." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987).

[6] Here, any reasonable police officer (as indeed did these officers) would understand that Sessoms expressed his desire to have a lawyer present at his interrogation. Forty seconds into the conversation, before any meaningful exchange took place, Sessoms requested counsel twice in rapid succession. First, Sessoms said "There wouldn't be any possible way that I could have a — a lawyer present while we do this?" Although it was couched in a polite and diffident manner, the meaning of Sessoms's request was clear: he wanted a lawyer then and there.

If there were any doubt (which there should not have been), Sessoms immediately made a *second* statement: "Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer." Simply put, the words "give me a lawyer" mean just that: "give me a lawyer."

Each of Sessoms's statements, taken on its own, clearly expresses his desire for an attorney. But when the two statements are taken together, that conclusion is indisputable.[8]

---

[8]Both the state court and the dissent analyze Sessoms's statements in isolation but do not consider the meaning of the two statements together.

Of course, the best test of how a reasonable police officer would understand Sessoms's request is how the actual police officer in this case responded. That reaction is telling. Detective Woods's response to Sessoms's statements—informing Sessoms that a lawyer would only prevent him from giving his side of the story and that, in any event, invocation was futile because the police already knew what happened—shows that he knew Sessoms was requesting a lawyer, and he wanted to do his best to talk Sessoms out of it. This desire is understandable. Detective Woods had flown halfway across the country to speak to Sessoms about a murder case, and it was surely frustrating when Sessoms requested a lawyer only forty seconds into the interrogation. But the "rigid prophylactic rule of *Edwards*" requires the police to cease questioning immediately when a suspect requests counsel and forbids any attempt to badger a suspect into waiving his previously asserted rights. *Davis,* 512 U.S. at 458 (internal quotation marks omitted); *Harvey*, 494 U.S. at 350.

The California Court of Appeal's decision could only be defended by "disregard[ing] . . . the ordinary meaning" of Sessoms's statements. *Barrett*, 479 U.S. at 530. This is forbidden by clearly established federal law. All that is required is some expression of a desire for the assistance of an attorney and Sessoms made his wishes sufficiently clear.

## IV.   CONCLUSION

Davis's requirement that a request for counsel be unambiguous does not apply to this case. The state court acted unreasonably by requiring Sessoms to unequivocally or unambiguously invoke his right to counsel. Under *Miranda* and *Edwards*, Sessoms invoked his right to counsel. Law enforcement—those responsible for enforcing the rule of law—may not disregard the constitutional safeguards imposed by *Miranda*, which ensure the protection of the Fifth Amendment's right against self-incrimination.

**[7]** Upon hearing Sessoms's request for an attorney, Detectives Woods and Keller were required to immediately terminate all questioning. *See Miranda*, 384 U.S. at 444-45. They failed to do so. Therefore, Sessoms's incriminating statements were obtained in violation of *Miranda* and their admission at Sessoms's trial violated his clearly established rights under the Fifth and Fourteenth Amendments. *See Edwards*, 451 U.S. at 486-87.

**[8]** We reverse the district court's denial of habeas relief and remand with instructions to grant a conditional writ of habeas corpus with directions that the state retry Sessoms within a reasonable period, or release him.

REVERSED and REMANDED.

---

FISHER, Circuit Judge, with whom B. FLETCHER, WARDLAW, and PAEZ, Circuit Judges, join, concurring:

I fully concur in the majority opinion. I also conclude, contrary to the dissent, that even if it were reasonable to apply the more stringent standard of *Davis v. United States*, 512 U.S. 452 (1994), the California Court of Appeal unreasonably applied that standard. For the reasons stated in the majority opinion, the only reasonable conclusion was that Sessoms' statements, taken together, unambiguously conveyed his desire to have counsel present.

---

MURGUIA, Circuit Judge, with whom KOZINSKI, Chief Judge, and SILVERMAN, CALLAHAN, and IKUTA, Circuit Judges, join, dissenting:

I respectfully dissent. The majority invalidates a conviction on the ground that the state court reached a decision that was

contrary to and an unreasonable application of clearly estab-
lished federal law. According to the majority, the California
Court of Appeal unreasonably applied *Davis v. United States*,
512 U.S. 452, 459 (1994), to the pre-waiver context. But the
majority eschews the high level of deference we owe a state
court under the Antiterrorism and Effective Death Penalty Act
("AEDPA"), 28 U.S.C. § 2254. A federal habeas court may
not grant relief unless no reasonable jurist could agree with
the state court's determination. *See Harrington v. Richter*, 131
S. Ct. 770, 786 (2011). On the record before us, a reasonable
jurist could conclude not only that the *Davis* standard applies
to pre-*Miranda* statements, but also that Sessoms's request
was ambiguous and equivocal. I would, therefore, affirm the
district court's judgment denying relief.

I

Before the police read him his *Miranda* rights, Sessoms
said, "There wouldn't be any possible way that I could have
a — a lawyer present while we do this? . . . Yeah, that's what
my dad told me to ask you guys . . . uh, give me a lawyer."
The majority holds the state court reached a decision that was
contrary to and an unreasonable application of clearly estab-
lished federal law in concluding that if Sessoms wanted the
officers to stop the interrogation, he had to make a clear
request for counsel as required by *Davis*. Under AEDPA, Ses-
soms is only entitled to relief if the state court unreasonably
applied "clearly established federal law." 28 U.S.C.
§ 2254(d)(1). "Clearly established Federal law" refers to the
holdings, not the dicta, of the Supreme Court as of the time
of the relevant state court's decision. *Lockyer v. Andrade*, 538
U.S. 63, 71 (2003). The Supreme Court has never held that an
ambiguous request for counsel was enough to stop an interro-
gation. When the Supreme Court has had occasion to consider
the issue, it has either expressly declined to reach it, *Smith v.
Illinois*, 469 U.S. 91 (1984), or held that only an unambiguous
invocation requires police to terminate the interrogation.

*Davis*, 512 U.S. at 460-61; *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010).

In *Smith*, the Supreme Court did not address the consequences of an ambiguous inquiry about counsel, because the invocation in that case was clear. 469 U.S. at 99-100 ("We do not decide the circumstances in which an accused's request for counsel may be characterized as ambiguous or equivocal . . . ."). The Court found it unnecessary to resolve the conflict in the lower courts on this point. Thus, *Smith* confirmed that the consequences of an ambiguous request for counsel was an unsettled question in *Miranda's* wake, and that there was no established law on point.

When the Supreme Court did reach the question in *Davis*, it held that "if a suspect makes a reference to an attorney that is ambiguous or equivocal . . . *our precedents do not require the cessation of questioning*. Rather, the suspect must unambiguously request counsel." 512 U.S. at 459 (emphasis added). In expounding this rule, the Court in *Davis* reasoned that "when the officers conducting the questioning reasonably do not know whether the suspect wants a lawyer, a rule requiring the immediate cessation of questioning 'would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity.' " *Id.* at 460 (quoting *Michigan v. Mosley*, 423 U.S. 96, 102 (1975)). In applying this reasoning to the facts of the case, the *Davis* court held that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id.* at 461. While the Court noted that this rule (requiring a suspect to clearly request an attorney) applied to situations where the suspect had waived *Miranda* rights, the Court did not specifically address whether or not the rule's applicability was confined to that period. Thus, it was not contrary to established law or unreasonable for the California Court of Appeal to apply the *Davis* rule to Sessoms's case.

In fact, the Supreme Court has recently confirmed that Davis's reasoning applies equally in the pre-waiver context. *Berghuis*, 130 S. Ct. at 2260; *see also United States v. Plugh*, 648 F.3d 118, 124-25 (2d. Cir. 2011) (applying *Davis* to the pre-waiver context in light of *Berghuis*); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) (applying *Davis* where defendant asked about an attorney "before being read his *Miranda* rights, before being interrogated and even before biographical questioning"). The *Berghuis* Court, without qualification, held: "If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' or makes no statement, the police are not required to end the interrogation, or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." 130 S. Ct. at 2259-60 (quoting *Davis*, 512 U.S. at 461-62). The Court reiterated the practical considerations underlying the rule:

> There is good reason to require an accused who wants to invoke his or her [*Miranda* rights] to do so unambiguously. A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that avoid[s] difficulties of proof and . . . provide[s] guidance to officers on how to proceed in the face of ambiguity. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression if they guess wrong. Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity.

*Id.* at 2260 (citations and internal quotation marks omitted). Although *Berghuis* had not been decided at the time the state court ruled on Sessoms's claims, the holding confirms that it was not unreasonable for the California Court of Appeal to apply *Davis* in this case.

The majority relies upon excerpted sentences from *Miranda*-related precedent to suggest there is a Supreme Court rule that says: Any statement by a suspect that could be interpreted as a request for a lawyer is an invocation of the right to counsel. The majority then suggests that the rulings in *Davis* and *Berghuis* carved out narrow exceptions to this "rule." But the Supreme Court has never held that an ambiguous statement or question regarding counsel is enough to stop an interrogation. While *Miranda* established that a suspect could stop the questioning by "indicat[ing] in any manner and at any stage of the process that he wishes to consult with an attorney before speaking," *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966), the decision did not address what the police were supposed to do when the suspect's "indication" was ambiguous.

Similarly, *Edwards v. Arizona*, which held that a suspect cannot be subjected to further questioning once he has "expressed his desire to deal with the police only through counsel," says nothing about what constitutes a sufficient expression of that desire. 451 U.S. 477, 484 (1981). Rather, *Edwards* said that authorities may not continue to interrogate a suspect who "has *clearly* asserted his right to counsel." *Id.* at 485 (emphasis added). This language suggests that an unambiguous statement is required. *See Davis*, 512 U.S. at 460 (citing to this portion of *Edwards* to support point that assertion must be clear and unambiguous). *Edwards*, of course, does not provide much guidance on the issue of ambiguity, because the suspect in that case plainly stated, "I want an attorney before making a deal." *Id.* at 479.

When the Supreme Court in *McNeil v. Wisconsin* said that an invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police,*" 501 U.S. 171, 178 (1991), it was explaining why requesting legal representation for a bail hearing would not preclude a subsequent

police interrogation. *McNeil* did not set out the standard for assessing a suspect's ambiguous inquiry about counsel at the start of a custodial interrogation, as the majority implies.

The majority also suggests that its reliance on *McNeil* is supported by *Davis*, stating:

> When there has not been a knowing and voluntary waiver, "[i]nvocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney,' " *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)), but the assertion need not be "unambiguous or unequivocal," *id.* at 462.

Maj. Op. at 9318. In addition to misconstruing *McNeil*, this passage turns *Davis* on its head. Nowhere in *Davis* is there any statement suggesting that "the assertion need not be 'unambiguous or unequivocal.' " Indeed, this is made clear by the very next line in *Davis*:

> Invocation of the Miranda right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *McNeil v. Wisconsin*, 501 U.S., at 178. *But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning.*

*Davis*, 512 U.S. at 459 (emphasis added). The problem with the majority's analysis becomes even more apparent looking at the entire sentence from which it selectively lifts "unambiguous or unequivocal": "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers

have no obligation to stop questioning him." *Id.* at 461-62. This sentence in no way supports the majority's statement that "the assertion need not be 'unambiguous or unequivocal.'" The Supreme Court has *never* held, in *Davis* or in any case, that an ambiguous or equivocal statement regarding an attorney is sufficient to invoke a suspect's right to counsel.

The majority criticizes the state court for applying *Davis* in this case because Sessoms had not been read his *Miranda* rights before he referenced a lawyer. *Cf. United States v. Doe*, 170 F.3d at 1166 (holding that "a statement concerning an attorney made before interrogation begins is far less likely to be a request for attorney assistance during interrogation than a similar statement made during custodial interrogation"). The majority points to the emphasis in *Davis* and *Berghuis* on the protection provided by the *Miranda* warnings, as grounds for requiring a lower standard of clarity in the pre-*Miranda* context. *Davis*, 512 U.S. at 460-61; *Berghuis*, 130 S. Ct. at 2260; *but see United States v. Doe*, 170 F.3d at 1166. But here, after Sessoms referenced a lawyer, the detective read Sessoms his *Miranda* rights. Thus, Sessoms was Mirandized after he asked about a lawyer, and, as such, was expressly advised of his right to counsel. It was only after that advisement and Sessoms's waiver that the police questioned him.

The majority asserts that the waiver only occurred because the seasoned detective, aware that Sessoms might want a lawyer, used the brief time before he read Sessoms his *Miranda* rights to pressure him into waiving them. Sessoms, however, does not claim he was improperly coaxed into waiving his *Miranda* rights; instead, he claims that he invoked his right to counsel. And because the policy considerations emphasized by the Supreme Court in *Davis* and *Berghuis* apply equally before and after the *Miranda* rights have been read, it was not unreasonable for the state court to require an unambiguous request for counsel in this case.

Finally, and most importantly, the Supreme Court has never held that a different standard applies prior to the reading of

the *Miranda* rights. " '[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.' " *Harrington*, 131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

In these circumstances, I cannot conclude that the California Court of Appeal reached a decision that was contrary to or an unreasonable application of clearly established federal law in ruling that only an unambiguous invocation of the right to counsel would have required the detectives to stop Sessoms's interrogation. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." (citations and internal quotation marks omitted)); *Carey v. Musladin*, 549 U.S. 70, 77 (2006) ("Given the lack of holdings from this Court . . . it cannot be said that the state court unreasonably applied clearly established Federal law.") (alterations and internal quotation marks omitted); *Yarborough v. Alvarado*, 541 U.S. 652, 666-67 (2004) (holding that court was nowhere close to the mark in ruling that the state court had unreasonably applied established federal law by failing to consider a suspect's age when determining custodial status, where "[the Supreme Court's] opinions applying the *Miranda* custody test have not mentioned the suspect's age, much less mandated its consideration"); *DeWeaver v. Runnels*, 556 F.3d 995, 1002 (9th Cir. 2009) ("We . . . could not conclude that application of the *Davis* rule to an invocation of the right to remain silent is contrary to or an unreasonable application of Supreme Court precedent where the Supreme Court has neither squarely addressed when an ambiguous statement amounts to an invocation of the right to remain silent nor refused to extend the *Davis* rule to an invocation of the right to remain silent." (alterations and internal quotation marks omitted)).

## II

Having determined that it was not unreasonable to apply *Davis* in this case, I also consider whether the state court was objectively unreasonable in concluding that Sessoms's statement was not an unambiguous request for counsel. Even if I would have decided differently had I been on the California Court of Appeal, the law is clear that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002). Our review is constrained, sometimes painfully so, by AEDPA, which "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington*, 131 S. Ct. at 786.

*Davis* provides: "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." 512 U.S. at 459. In this case, Sessoms first asked, "There wouldn't be any possible way that I could have a, a lawyer present while we do this?" The California Court of Appeal concluded that a reasonable police officer could have interpreted Sessoms's first question as asking only whether he was allowed to have a lawyer present, rather than actually requesting a lawyer. When reviewing a habeas petition from a state court, this Court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision; and then [we] must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Harrington*, 131 S. Ct. at 786.

The state court decision was not an objectively unreasonable application of *Davis*. Sessoms's question, punctuated

with hesitation, conditions, and phrased in the negative, is subject to different interpretations and comparable to statements that this Court and other courts have found ambiguous. *Compare Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer."); *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) ("[B]ut, excuse me, if I am right, I can have a lawyer present through all this, right?"); *Clark v. Murphy*, 331 F.3d 1062, 1065 (9th Cir. 2003) ("I think I would like to talk to a lawyer."), *overruled on other grounds by Lockyer*, 538 U.S. 63; *United States v. Doe*, 170 F.3d at 1166 ("What time will I see a lawyer?"); *Diaz v. Senkowski*, 76 F.3d 61, 63-65 (2d Cir. 1996) ("I think I want a lawyer."); *Lord v. Duckworth*, 29 F.3d 1216, 1218-21 (7th Cir. 1994) ("I can't afford a lawyer but is there any way I can get one?"); *with Anderson v. Terhune*, 516 F.3d 781, 783 (9th Cir. 2008) (en banc) ("I plead the fifth."); *Edwards*, 451 U.S. at 479 ("I want an attorney before making this deal.").

Sessoms also followed up his question with this statement: "That's what my dad told me to ask you guys. . . uh, give me a lawyer." It is unclear from this statement if Sessoms is merely expressing his father's opinion or if he is agreeing with his father and he himself wants an attorney. Either interpretation is plausible. A reasonable jurist could conclude that telling a detective "My dad told me to ask for a lawyer" is different than saying "I want an attorney." Because it cannot be said that no reasonable jurist would find either of Sessoms's statements, viewed individually or together, to be ambiguous and equivocal, relief is barred by AEDPA.

The majority points to the detective's reaction to Sessoms's question as evidence that the detective believed Sessoms invoked his right to counsel. The officer stammered and, the majority claims, proceeded to persuade Sessoms to waive his right to counsel. The detective's reaction, however, could easily have been that of an officer faced with a suspect who only *might* have invoked his right to counsel and relayed his

father's advice at the start of an interrogation. The detective's answer supports this theory:

> Uh, I want to back up to your question you asked about an attorney. Um, first, before you ask questions, uh, I'm going to tell you why we're here, just lay it out and be up front. And then — then I'm going to advise you of your rights. And then it's up — for you to decide if you want the attorney or not.

The majority believes the officers should have answered Sessoms's question by simply saying "yes" and terminating the interrogation. The majority claims that in the brief exchange before Sessoms was read his *Miranda* rights, the detective manipulated Sessoms into waiving his right to counsel. Again, however, Sessoms is not claiming that he was pressured into an involuntary waiver, but only that he asked for counsel, which should have terminated the interrogation. "[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*." *McNeil*, 501 U.S. at 178. Unless Sessoms clearly invoked his right to counsel, the police officers were not required to take any particular course of action in response to his statements or questions. *See Davis*, 512 U.S. at 460. As such, the majority's focus on the detective's reaction at that stage is misplaced.

I acknowledge that this reasoning results in a harsh outcome for a nineteen-year-old who turned himself in, expressly told the officers that his father wanted him to have a lawyer, and may have been trying to be respectful when asking for counsel. However, when it set out the rule in *Davis*, the Supreme Court understood and accepted that a strict rule would disadvantage certain individuals who wanted counsel:

> We recognize that requiring a clear assertion of the right to counsel might disadvantage some suspects who — because of fear, intimidation, lack of linguistic skills, or a variety of other reasons — will not

clearly articulate their right to counsel although they actually want to have a lawyer present.

*Davis*, 512 at 460-61. The law is clear.

Could the police officers have assumed that Sessoms was in fact asking for a lawyer? Yes. Was it objectively unreasonable for the California Court of Appeal to hold that a police officer could have interpreted Sessoms's statement as a possible request for a lawyer rather than an actual request for a lawyer, which would not require the officer to stop the interrogation? I cannot say that it was. Because this Court is constrained by the deference mandated by AEDPA, even when faced with a close case where it may have ruled differently than the state court, I respectfully dissent.